**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Infowhyse GmbH, a German company with limited liability. | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **Case No.**     **1: 15-cv-11229** |
| Fleetwood Group, Inc., a Michigan corporation, | ) ) ) | **JURY DEMANDED** |
| Defendant. | ) ) | |

**COMPLAINT**

Plaintiff, INFOWHYSE GMBH, through its attorneys, SYNERGY LAW GROUP, LLC,

for its Complaint against Defendant, FLEETWOOD GROUP, INC., alleges:

**NATURE OF THIS ACTION**

1.        This is an action by Infowhyse GmbH ("Infowhyse") against Fleetwood Group,

Inc. ("Fleetwood") for Fleetwood's fraudulent scheme to induce Infowhyse to enter into the

Strategic Partnership Agreement by misrepresenting Fleetwood's sales, breach of the Strategic

Partnership Agreement afterward, and tortious interference with Infowhyse's prospective

economic advantage.  Now, Fleetwood is trying to force Infowhyse to relinquish its rights in the

Reply® brand in derogation of Fleetwood's implied covenant of good faith and fair dealing.

With this suit, Infowhyse seeks only that to which it is contractually entitled, unfettered by

Fleetwood's attempts to retain a purchase price that it obtained through fraud.

**PARTIES**

2.        Infowhyse is a German company with limited liability, with its principal place of

business located in Bad Nauheim, Germany.

1

3. Fleetwood is a corporation organized under the laws of the state of Michigan, with its principal place of business located in Holland, Michigan.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2). This is an action between a citizen of Germany and a citizen of Michigan. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3). The Strategic Partnership Agreement ("SPA") provides that "[t]he parties hereby submit to the exclusive jurisdiction of the state of Illinois and federal courts as regards [to] any claim, dispute or matter arising out of or relating to this Agreement." (SPA at Section III(2), attached to and incorporated into this Complaint as Exhibit A.)

## FACTUAL ALLEGATIONS

### A. Background

6. Infowhyse is a leading provider of audience response systems with an extensive network of resellers and rental network partners located in over 20 countries across the globe.

7. Fleetwood manufactures portable audience response systems, language and learning labs, and mobile educational furniture and storage systems.

8. Fleetwood's Electronics Division manufactures Reply® wireless interactive devices on behalf of Infowhyse as well as non-Reply® branded wireless interactive systems under OEM agreements for third parties.

9. Reply® keypads are distributed to audience participants, typically in business meetings or educational classrooms, and allow the participants to provide responses in real time through the Reply® audience response systems.

10. Infowhyse's website provides that "Reply® is undoubtedly the most respected and trusted name in Audience Response Systems across the globe."

11. On September 16, 2013, Infowhyse and Fleetwood entered into a licensing agreement titled the Strategic Alliance Agreement.

12. Under that agreement, Fleetwood granted Infowhyse an exclusive license for the Reply® brand of audience response systems across Europe, the Middle East, and Africa.

13. On August 6, 2014 Suneel ("Neil") Mirchandani, CEO of Infowhyse, sent a discussion document to Heather Waller, Director of Sales for Fleetwood Electronics, proposing that the parties meet in Holland, Michigan to discuss a new, expanded licensing arrangement.

14. The discussion document initially contemplated either that Fleetwood would manufacture all Infowhyse keypads or that Infowhyse would obtain an exclusive license to sell Reply® brand keypads across the globe.

**B. Fleetwood Misrepresents the Number of Reply® Units Sold**

15. On August 13, 2014 Mr. Mirchandani met with two Fleetwood representatives, Doug Ruch and Ms. Waller, to discuss the proposed relationship.

16. During the August 13, 2014 meeting, the parties agreed that an exclusive license for the Reply® brand was the best option. Mr. Mirchandani asked how many Reply® branded keypads Fleetwood had sold in the preceding year, and Ms. Waller responded that 77,000 Reply® branded keypads were sold during Fleetwood's fiscal year ending March 31, 2014. Mr. Mirchandani asked for a detailed breakdown of the 77,000 sales, but Ms. Waller responded that she did not have a breakdown on hand and would provide it later.

17. The parties' meeting continued on August 14, 2014, during which Fleetwood expressed concern that if the exclusive license agreement was not successful, the Reply® brand

would be far less valuable than it was at the current time. Accordingly, the parties' explored the possibility of Infowhyse purchasing the Reply® Brand under a new agreement, titled the Strategic Partnership Agreement ("SPA").

18. The 77,000 sales figure provided by Fleetwood made the Reply® brand extremely appealing to Mr. Mirchandani. For the calendar year ending December 31, 2014, Infowhyse was forecasting sales of approximately 15,000 keypads. Accordingly, the acquisition of the Reply® brand and exclusive sales rights would represent a greater than 400% increase in sales for Infowhyse.

19. Mr. Mirchandani informed Ms. Waller and Mr. Ruch that he would calculate a purchase price based on the 77,000 sales figure for Reply® brand keypads provided by Ms. Waller. A target growth rate of 30% aggregate sales growth over a 10 year term correlates to the sale of approximately 100,000 Reply® keypads per year. Mr. Mirchandani explained that he was willing provide a purchase price of $1.00 to Fleetwood for each Reply® brand keypad purchased by Infowhyse over ten years, equaling a final valuation of $1,000,000.00.

20. Mr. Mirchandani also proposed that, as a security against Infowhyse's inability to sell 1,000,000 Reply® keypads by the end of the 10 year term, Infowhyse would either pay the deficiency or ownership of the Reply® brand would return to Fleetwood at the conclusion of the term.

21. Mr. Mirchandani was willing to make such a significant commitment to Fleetwood because, based on the 77,000 sales figure provided by Fleetwood, Mr. Mirchandani believed that Infowhyse would be able to increase its keypad sales by 30%. Mr. Mirchandani was also willing to offer this security to Fleetwood because Fleetwood promised to join

Infowhyse in its efforts to grow the volumes of Reply® branded keypads sold and rented by Infowhyse and to provide Infowhyse with new products on a commercially viable basis.

22.     Infowhyse was willing to pay $1,000,000.00 for the Reply® brand based on the numerous business advantages that would come along with it.  Reply® was the most trusted and respected brand in the industry, and ownership of that brand would give Infowhyse an instant boost in credibility.  Further, Infowhyse would experience an increase in sales, revenue, and profit per year.  Infowhyse would also gain access to the North American market, where Infowhyse had no sales.

23.     Another important factor leading to Infowhyse's willingness to purchase the Reply® brand was substantial future growth potential through the development of new and innovative products that operated on the Fleetwood RF protocol, and therefore existed within the existing Reply® ecosystem.  Infowhyse's control of that ecosystem provided it a significantly increased reseller network and a legacy client base that had purchased more than 1,000,000 Reply® keypads in the past.

24.     Ms. Waller and Mr. Ruch, on behalf of Fleetwood, were receptive to the proposed 10-year structure because the guarantee of full payment or return of the brand mitigated the risk to Fleetwood.

25.     The parties also discussed additional details of the proposed purchase during the August 14, 2014 meeting.  Mr. Mirchandani emphasized that he was interested in the entire Reply® brand, including domains, taglines, and all intellectual property, to which Fleetwood agreed with the exception of Fleetwood's patents and Fleetwood's RF protocols, which were excluded from the intellectual property to be transferred.  Mr. Mirchandani also expressed his

desire to receive 100% of the global sales volumes for the Reply® brand, to which Fleetwood agreed.

26.     Equally important to any agreement was both parties' willingness to contribute to the growth and success of the Reply® brand.  Both Fleetwood and Infowhyse committed to grow the sales volumes of Reply®-brand keypads and Fleetwood committed to creating new products for Infowhyse under the Reply® brand.

27.     Further to their commitments, the parties discussed in detail Fleetwood's practice of OEM manufacturing for third parties.  Under Fleetwood's existing OEM practice, OEM keypads required a unique housing that differentiates OEM products from Reply® keypads and a unique ID in order to prevent OEM keypads from communicating with Reply® keypads.

28.     Fleetwood, through Ms. Waller and Mr. Ruch, agreed that all of Fleetwood's global Reply® resellers would be transferred to Infowhyse and promised that Fleetwood would cease providing Reply® branded keypads, or any privately-branded versions in the same housing, after December 31, 2014.  The only exceptions were the Reply® Leaf for All in Learning, the Reply® Plus for DSI, and the Reply® Ativa for an undisclosed potential customer that Fleetwood was negotiating with at that time.

29.     Any other non-Reply® brand products manufactured for third parties would require the third party to invest in a unique housing for the keypad, among other things.  These productions would be considered OEM projects and would be separate from Infowhyse's exclusive right to market the Reply® brand.

30.     It was also critical to Infowhyse that OEM projects have a unique ID to prevent the OEM products from communicating with Reply® brand products.  Fleetwood, through Mr.

Ruch and Ms. Waller, indicated that this was already the case for all existing OEM products being sold.

31.     Preventing third party devices from communicating with Reply®-brand devices, and requiring third parties to invest in new housing to directly access the Fleetwood RF protocols, was a necessary component of Infowhyse's goal to increase Reply®-brand sales by 30%. Given the position of Reply® as the most popular and trusted brand in the market, customers desired having Reply®-brand keypads. Any ability by a third party to work in conjunction with Reply®-brand keypads, or for a third party to sell the same products under a different brand, would diminish the value of the brand and disincentivize customers from purchasing Reply® keypads. Brand exclusivity was a driving factor for Infowhyse.

32.     There was one customer, Option Technologies, Inc., that purchased private-branded products without either a unique housing or a unique ID from reseller DSI. Accordingly, the parties agreed that Option Technologies would be advised of Infowhyse's agreement with Fleetwood and would be required to choose between purchasing their products from Infowhyse in the future, or to change its products to the unique housings and IDs used by DSI.

33.     Based on the parties' agreements, Mr. Mirchandani drafted and sent to Fleetwood a new discussion paper on August 15, 2014 that outlined the proposed agreement for Infowhyse to purchase the Reply® brand.

34.     Mr. Mirchandani, Mr. Ruch, and Ms. Waller reconvened the afternoon of August 15, 2014 to further discuss the terms of the proposed sale of Reply® to Infowhyse. During that meeting, the parties' agreed to the deal in principle.

7

35.     Mr. Mirchandani prepared the SPA and sent a draft to Mr. Ruch, and Ms. Waller on August 18, 2014.  Fleetwood participated in the drafting of the SPA by seeking amendments and clarifications throughout the drafting process.  The SPA was executed on August 18, 2014 by Mr. Mirchandani on behalf of Infowhyse, and by Ms. Waller on behalf of Fleetwood.  (*See* Ex. A, SPA at pg. 8.)

36.     The scope of the SPA, among other things, is "[t]o transform ownership of the Reply® brand from Fleetwood Group, to Infowhyse GmbH" and "[t]o transfer the Infowhyse GmbH business from one of multiple brands and multiple divisions to one that is primarily operated and promoted under the Reply® brand."  (Ex. A, SPA at pg. 1.)

37.     Infowhyse agreed to purchase "the title and all rights to the Reply® brand (including the trade name, logos, any associated strap lines, domain names, and other intellectual property associated with the Reply® brand, etc.) for a sum of USD $1,000,000 payable over the duration of [the SPA]."  (Ex. A, SPA at Section II(A)(1).

38.     Infowhyse essentially guaranteed the achievement of the sales target by providing in the SPA that if Fleetwood had not received $1,000,000.00 in royalty payments by the end of the 10 year term, Infowhyse would either pay the deficiency to Fleetwood or ownership of the Reply® brand would return to Fleetwood.  (Ex. A, SPA at Section II(A)(3).)  In other words, whether or not Infowhyse was able to increase sales of Reply® keypads by 30%, Fleetwood would still receive $1,000,000.00.

39.     Infowhyse entered into the SPA based on Fleetwood's representation that it sold approximately 77,000 Reply®-branded keypads during Fleetwood's fiscal year ending March 31, 2014.  Infowhyse agreed to pay $1,000,000.00 to obtain rights to the Reply® brand and 100% of the unit volumes attributable to the Reply® brand based on Fleetwood's representation

that it sold 77,000 Reply®-branded keypads during Fleetwood's fiscal year ending March 31, 2014.

40.     In addition to setting a purchase price, Infowhyse relied on the 77,000 sales figure to calculate its inventory requirements and future investments.  Solely as a result of its agreement with Fleetwood, Infowhyse opened Keypad Depot, Inc., a North American Logistics and Support Center located in New Jersey.  Based on an estimation that 70% of the 77,000 Reply® branded keypads were sold in North America, a logistics center based in the United States was necessary for Infowhyse to coordinate distribution of those 50,000+ keypads and coordinate rental inventories.

### C.  Infowhyse Discovers the Misrepresentation

41.     On August 26, 2014, Ms. Waller sent an email to Mr. Mirchandani confirming that Fleetwood's actual Reply® brand sales figure for the prior year was 76,999 and provided a breakdown of sales.

42.     On September 3, 2014 Fleetwood sent to Mr. Mirchandani a list of resellers of Reply® brand keypads to whom Infowhyse would now sell.

43.     The list of resellers was much smaller than Mr. Mirchandani was expecting based on the number of units Fleetwood represented were sold.  On September 8, 2014 Mr. Mirchandani sent an email to Ms. Waller stating that he didn't understand how 77,000 keypads were sold based on the reseller list and requested further clarification.

44.     Ms. Waller responded "The missing links here are DSI and Innovision who continued to sell Reply to their existing customer and [through] their international resellers."

45.     On September 8, 2014 Mr. Mirchandani sent an email to Ms. Waller asking what proportion of the 77,000 figure was sold through DSI and Innovision.  After receiving no

response from Ms. Waller, Mr. Mirchandani sent a reminder of his request to Ms. Waller on September 16, 2014. Ms. Waller responded on September 19, 2014 that "they contributed a significant amount" and that "they were by far the two largest of all of the resellers," but provided no further specific information.

46. Mr. Mirchandani then asked Ms. Waller specifically how many of the 77,000 Reply® keypads were sold through DSI and Innovision.

47. Ms. Waller refused to divulge the specific numbers, stating only that both dealers sold greater than 10,000 units. Mr. Mirchandani sent an e-mail requesting more information and transparency to which Ms. Waller did not respond.

48. Mr. Mirchandani shared with Fleetwood all of his calculations, assumptions, and projections that led to his valuation of the $1,000,000.00 purchase price before the parties entered into the SPA.

49. Fleetwood agreed with Mr. Mirchandani's calculations, assumptions, and projections.

50. However, over time it became clear from Ms. Waller's disclosures that a large portion of the 76,999 sales cited by Fleetwood were not actually Reply®-brand keypads, as represented, but were OEM or privately-branded keypads that Fleetwood would continue to sell. Infowhyse expressed its concern regarding the 76,999 sales representation to Fleetwood's management team through e-mails and telephone conferences in July of 2015.

51. Mr. Mirchandani met with Jason Grant, Fleetwood's new CEO and Nick Hayhoe, Fleetwood's new Vice President of Innovation, for the first time in a series of meetings in Holland, Michigan between October 15, 2015 and October 20, 2015. Ms. Waller, Bryan Harvey,

Fleetwood's Firmware Engineer, and Travis Wilson, Fleetwood's Vice President of Operations and Electronics, were also present during parts of those meetings.

52.     During those meetings, Mr. Hayhoe and Mr. Grant admitted for the first time that Fleetwood sold only 33,000 Reply® branded keypads during Fleetwood's fiscal year ending March 31, 2014, not the 76,999 units initially represented to Infowhyse.

53.     Ms. Waller's and Mr. Grant's stated explanation for this misrepresentation was that, internally, Fleetwood records all sales of products using "Reply® technology" as sales of Reply® keypads.  In other words, Fleetwood included in its calculations keypads that were not branded as Reply®, despite explicitly labeling the sales figures with "Reply®" product names and Reply® product numbers in the August 26, 2014 email confirming 76,999 units sold, and despite confirming that DSI and Innovision each sold more than 10,000 Reply® Keypads the following month.

54.     Fleetwood's explanation is, like its original representation, false.  Fleetwood knew at the time the parties entered into the SPA that Infowhyse was contracting to acquire and sell only Reply® keypads, and Fleetwood knew at the time the parties entered into the SPA that sales figures for non-Reply® products were irrelevant to the terms of the SPA — particularly calculation of the purchase price.

55.     Fleetwood, through its authorized representatives Mr. Ruch and Ms. Waller, misrepresented the total sales of Reply®-branded keypads in order to induce Infowhyse into entering into the SPA and to secure a $1,000,000.00 purchase price for its Reply® brand as well as multi-millions of dollars in product sales during the term of the SPA.

56.     By misrepresenting the 77,000 units sold, Fleetwood was acutely aware that $1,000,000.00 was not the true value of the Reply® brand.

**D. Fleetwood Misrepresents its Ability to Create New Products**

57.    The parties contemplated, and set forth in the SPA, that Fleetwood would develop new Reply®-branded products for Infowhyse to release in new markets, thereby increasing both parties' sales volume and profitability.  (Ex. A, SPA at pg. 2.)

58.    Ms. Waller and Mr. Ruch, following consultation with their engineering team including Mike Glass and Mr. Harvey, on behalf of Fleetwood, represented to Mr. Mirchandani that three new products would be developed: Reply® Interact, Reply® Dialog, and Reply® Engage.

59.    Mr. Mirchandani asked if Fleetwood could manufacture the Reply® Interact at a cost of $9.00 per unit and the Reply® Dialog at a cost of $12.00 per unit.  Ms. Waller and Mr. Ruch, after consultation with Fleetwood's engineering team, agreed that those prices were feasible based on their review of Infowhyse's existing samples and representations, together with Fleetwood's internal calculations regarding the Reply® Mini Pro prototype.

60.    The parties included those target prices in Schedule A to the SPA.

61.    Mr. Mirchandani also asked if Fleetwood could manufacture the Reply® Engage for $18.00 per unit.  Ms. Waller and Mr. Ruch similarly represented that $18.00 would be feasible.

62.    Ms. Waller, on behalf of Fleetwood, specifically represented to Mr. Mirchandani on August 15, 2014 that Fleetwood was confident in its ability to manufacture the Reply® Interact for the target price or a slight variance (represented by "(target)" on Schedule A to the SPA) because the production requirements were similar to, indeed simpler than, a prototype product that Fleetwood had already developed called Reply® Mini Pro, which at that time was

being offered at $15.00 per unit and with a total Non-recurring Engineering ("NRE") cost of $45,000.

63.     Mr. Ruch and Ms. Waller, on behalf of Fleetwood, assured Mr. Mirchandani that if Fleetwood could not produce any contemplated new Reply® product at a commercially viable price, then Fleetwood would provide its RF protocol to a third party manufacturer to produce that new Reply® product.

64.     Based upon Fleetwood's representations, Mr. Mirchandani took steps to launch the Reply® Interact by January 1, 2015, or the end of the first quarter of 2015 at the latest. Infowhyse pulled back from negotiations with other manufacturers who had been supplying a similar product under Infowhyse's VoteWorks® brand.  Infowhyse booked a stand at a large trade show in preparation for the launch of both the Reply® Interact and the Reply® Dialog. Finally, Infowhyse informed its key resellers and key customers that new products, which operated on the same RF protocol as the existing Reply® products, would soon be launched.

65.     Based upon Fleetwood's representations, Mr. Mirchandani took the same steps to launch the Reply® Dialog approximately three months after the launch of the Reply® Interact.

66.     From the parties' execution of the SPA through the end of December 2014, the production price of the Reply® Interact and Reply® Dialog steadily rose.  In addition, there were multiple production delays precluding the launch of these products.

67.     During that period, on November 26, 2014, after inducing Infowhyse to enter into the SPA and only in response to Infowhyse's plea for help due to the already lengthy delays, Ms. Waller advised Mr. Mirchandani that Fleetwood could not provide Fleetwood's RF protocol to a third party manufacturer.  This admission directly contradicted Mr. Ruch's and Ms. Waller's

13

prior assurance that providing the RF protocol to a third party was Infowhyse's protection in case Fleetwood could not manufacture any new Reply® product at a commercial viable price.

68.     By April 2015, Infowhyse and Fleetwood had agreed to a revised development plan for both the Reply® Interact (by now called Reply ® Mini Pro) and the Reply® Dialog (by now called Reply® Mini Max). Infowhyse was forced to accept the considerably higher unit prices and NRE costs in order to get the products to market quickly and to be able to launch them at the Infocomm Trade Show that Infowhyse had already booked in Orlando, Florida in June 2015. As part of the agreement, Fleetwood promised at the very least to have prototypes ready for the trade show.

69.     Ms. Waller asked Mr. Mirchandani to draft the revised development agreement, which he did using an older Fleetwood Supply and Manufacturing agreement as a template. Mr. Mirchandani sent the agreement to Ms. Waller on April 23, 2015. On May 8, 2015, Ms. Waller advised that the new management was looking to simplify the Supply and Manufacturing agreements and they were working to get a new agreement to Infowhyse. Despite several reminders from Infowhyse, Fleetwood did not provide a new agreement before the June 8, 2015 trade show in Florida. Instead, around the end of June 2015, Fleetwood advised that its pricing would again increase.

70.     Finally, on July 2, 2015 Ms. Waller sent Mr. Mirchandani a written production agreement for Fleetwood's new products. It contemplated only the Reply® Mini Pro, in a format that was substantially simplified from what was previously agreed, and set a price per unit of $28.91, more than three times the $9.00 target price Fleetwood originally conveyed to Mr. Mirchandani. It did not include a production agreement for the Reply® Mini Max or the Reply® Engage.

14

71.     Additionally, the written production agreement provided for minimum volume commitments, which had not been an agreed-upon term in the original SPA, and NRE costs that were substantially greater than Fleetwood originally represented.

72.     Up to and at the time the parties entered into the SPA on August 18, 2014, Fleetwood misrepresented its ability to produce new products at the agreed prices and within the time frame contemplated by the parties. Fleetwood agreed to the "target" prices for the Reply® Interact and Reply® Dialog as part of its scheme to induce Infowhyse into agreeing to the SPA, knowing that it could never produce those new products at those prices. Fleetwood did this because it did not want anything to interfere with Infowhyse's willingness to pay to Fleetwood the multimillion dollars that Infowhyse would generate for Fleetwood under the SPA.

73.     As further evidence of Fleetwood's scheme to defraud Infowhyse by inducing Infowhyse into entering into the SPA, Mr. Grant represented to Mr. Mirchandani during the October 2015 meetings in Holland, Michigan that Fleetwood had at the time of the negotiations in August 2014 been considering shuttering its audience response business. Mr. Grant further stated that Infowhyse's willingness to purchase the Reply® business for $1,000,000.00 in 2014 was viewed by Fleetwood as the savior of the Fleetwood electronics business.

74.     Before the parties entered into the SPA on August 18, 2014, Fleetwood had not given Infowhyse any indication that its electronics business was in distress.

75.     Thus, with its audience response and electronics business on the brink of extinction, Fleetwood was desperate to ensure that the deal with Infowhyse was completed. That desperation manifested itself as Fleetwood's misrepresentation of sales volume that was more than 233% of the actual sales volume for Reply® keypads, and misrepresentations as to its ability to manufacture new products at an economically viable price.

15

### E. Additional Breaches of the SPA by Fleetwood

76.     The SPA provides that "Fleetwood shall not offer private branding of Reply® products to existing dealers or any other 3rd party during the term of this agreement.  This clause does not prohibit Fleetwood from offering OEM agreements to 3rd parties providing that any product provided under such OEM agreement or similar does not have the ability to communicate with Reply® Products (i.e. has a unique device identification preventing it from working with Reply® productions), or that in any way contains the Reply® Brand."  (Ex. A, SPA at Section II(B)(6).)

77.     Before the parties entered into the SPA, Innovision and DSI were resellers of Reply® brand keypads.

78.     After the parties entered into the SPA, and in violation of the SPA, Fleetwood provided Innovision privately-branded keypads using the same housing as the Reply®-branded versions, and Fleetwood provided DSI versions (OptionFinder) using the same housing as the Reply®-branded versions.

79.     The new keypads sold to Innovision and DSI after December 31, 2014 are not OEM products as contemplated by the SPA.  Innovision and DSI were not required to invest in unique housing for the keypads.  Rather, Fleetwood is simply applying a different brand name to what are otherwise Reply® brand keypads that Infowhyse has an exclusive contract to sell. Furthermore these actions by Fleetwood specifically and knowingly eroded the Reply®-brand volumes that would otherwise have gone through Infowhyse.

80.     At least until September of 2015, Innovision and DSI were able to offer their keypads to end users a lesser cost than Infowhyse was able to offer.

81. These sales are a breach of the SPA and undermine the parties' agreement to grow the sales and visibility of the Reply® brand.

82. In addition, Infowhyse is aware of at least one shipment of Reply® brand keypads to a third party after December 31, 2014, which is a direct breach of the SPA. (Ex. A, SPA at Section II(B)(2).)

83. Moreover, Section II(F)(1) of the SPA provides that "'Fleetwood' warrants that each Product is free of any defect in materials and workmanship, is merchantable and of merchantable quality." (Ex. A, SPA at Section II(F)(1).)

84. In direct violation of that Section, Fleetwood filled Infowhyse's August 2015 and September 2015 orders with defective keypads. Fleetwood has acknowledged that the keypads are defective.

85. Lastly, Section II(G)(1) of the SPA provides that "'Fleetwood' shall supply all SDK's/API's and (where appropriate command structures) to enable 'INFOWHYSE' to develop software on all the Reply hardware platforms and shall supply whatever support is required without charge. All SDK/API's shall be provided without charge and without any time restrictions/expiry dates." (Ex. A, SPA at Section II(G)(1).)

86. Fleetwood denied Infowhyse access to the command structures that would enable Infowhyse to develop software development kits necessary for the development of software on MAC platforms. Fleetwood later demanded that unreasonable conditions be met, despite Fleetwood's unrestricted commitment to provide command structures where appropriate.

87. Each of these actions by Fleetwood is a violation of Section II(G)(1) of the SPA, and is preventing Infowhyse from expanding the Reply® brand into new, key markets.

## COUNT I – FRAUDULENT INDUCEMENT

88.     Infowhyse incorporates by reference paragraphs 1- 87 of this Complaint as though fully alleged in Count I.

89.     To induce Infowhyse into entering into the SPA, Fleetwood knowingly made false statements of material fact by representing to Infowhyse that Fleetwood sold approximately 77,000 Reply® keypads during its fiscal year ending March 31, 2014.

90.     After Infowhyse entered into the SPA and began performing its obligations, Fleetwood admitted that it sold only 33,000 Reply® keypads during that fiscal year.  Fleetwood did not volunteer this information, but provided it to Infowhyse only in direct response to Infowhyse's inquiries.

91.     Fleetwood made further false statements of material fact when it represented to Infowhyse that it could manufacture two new products, Reply® Interact and Reply® Dialogue, for a target cost per unit of $9.00 and $12.00, respectively.  Those target prices were included in the SPA at Schedule A and were patently false.

92.     Fleetwood knew at the time the parties entered into the SPA that it could not manufacture either product at or around the quoted target price.  After months of concerted concealment as part of Fleetwood's scheme to defraud Infowhyse, Fleetwood ultimately revealed that it could manufacture only the Reply® Interact for $28.91, more than three times the target price.  It is not economically viable for Infowhyse to sell the Reply® Interact at that price.

93.     Fleetwood intended to induce Infowhyse into the agreement in order to obligate Infowhyse to invest $1,000,000.00 into Fleetwood's sales efforts and to save Fleetwood's struggling audience response business.  The SPA will ultimately result in millions of dollars in

additional revenue for Fleetwood in new unit sales over and above the $1,000,000.00 purchase price.

94.     In addition, during the October 2015 meetings,  Fleetwood's representatives confessed that Infowhyse's agreement to purchase the Reply® brand would save Fleetwood's electronics business.

95.     Fleetwood's misrepresentation regarding the sales of Reply®-branded keypads further induced Infowhyse into paying more for the Reply® brand than it was actually worth. Infowhyse never would have agreed to pay $1,000,000.00 for the brand if it knew that Fleetwood had sold only 33,000 Reply® brand units instead of the 77,000 Reply® brand units that it represented.  According to the valuation formula used by Infowhyse, on which Fleetwood knew and understood Infowhyse was relying, had Fleetwood accurately represented that it sold only 33,000 Reply® brand units, the reasonable purchase price would have been no more than $429,000.00 payable over 10 years.

96.     Infowhyse reasonably relied on Fleetwood's misrepresentations in calculating the purchase price for the Reply® brand.  The starting point for Infowhyse's valuation of the Reply® brand was the number of Reply® brand units sold in the preceding year.  That figure, misrepresented by Fleetwood, and the resulting revenues for Infowhyse from those sales, drove both Infowhyse's willingness to enter into the SPA and the amount that Infowhyse was willing to pay to Fleetwood over the course of 10 years to obtain the Reply® brand.

97.     Additionally, Infowhyse immediately cut back the sales of its own brand of keypads, VoteWorks®, and sold off the VoteWorks® brand in order to avoid market confusion. Infowhyse committed to transitioning its sales to solely the Reply® brand and directing all of its efforts to the growth and success of that brand.

19

98.     Infowhyse would not have agreed to pay Fleetwood $1,000,000.00 over ten years for the Reply® Brand, agreed to later move all production to Fleetwood's manufacturing plant in Michigan, or sold its strong European brand VoteWorks® if it knew that Fleetwood had sold only 33,000 Reply® keypads in Fleetwood's fiscal year ending March 31, 2014.

99.     Under the circumstances caused by Fleetwood's scheme to defraud Infowhyse, it would be economically unreasonable for the parties to terminate their relationship.  Infowhyse's core business requires continuing sales of Reply® keypads.  Further, termination would reward Fleetwood for its own fraud by allowing it to keep the Reply® brand, which Infowhyse is entitled to earn under the terms of the SPA.

100.    Accordingly, Infowhyse has fully performed and will continue performing under the SPA.

101.    However, Infowhyse has been materially damaged by Fleetwood's fraudulent inducement by entering into a contract based on misrepresentations at terms that are not economically viable.

102.    Infowhyse has been damaged in the amount of at least $571,000.00, the difference between the $1,000,000.00 purchase price that was derived based on Fleetwood's fraud and the pro rata price based on the true figure of Reply®-branded keypads sold during Fleetwood's fiscal year ending March 31, 2014.

103.    Infowhyse has been further damaged by the significant depreciation in Infowhyse's revenue projections based on this misrepresentation.

104.    Infowhyse has been further damaged by Fleetwood's misrepresentations regarding its ability to produce Reply® Interact (by now called Reply ® Mini Pro) and Reply® Dialog (by now called Reply ® Mini Max) keypads at or near the target prices.  The Reply®

Interact is a small, credit-card sized keypad with LCD lights, which was a product previously absent from the Reply® portfolio. The result was that competitors could offer such a keypad and erode the Reply® market share. If Fleetwood had not misrepresented that it could produce that product, Infowhyse would have introduced its then-existing VoteWorks® Interact into the North American market under the Reply® brand. The same is true for the Reply® Dialog, which would have allowed Infowhyse to compete more strongly in the educational market. Prior to the SPA, Infowhyse was already planning the production of a VoteWorks® Dialog that has since been scrapped.

105.    Infowhyse incurred numerous costs that arose primarily from the SPA that it only incurred based on the inflated 77,000 sales representation and the anticipation of receiving the new products. Those costs relate to the opening and operation of Keypad Depot in New Jersey, which Infowhyse never would have undertaken if it had known that the true sales volume of Reply® keypads for the preceding year was only 33,000.

106.    Infowhyse also incurred costs related to software acquisition and developments in anticipation of new products, marketing costs and expenses, and support purchases and activities provided by Infowhyse to Fleetwood. Each of these costs would have been substantially lower had the true unit sales figure been known by Infowhyse.

107.    Fleetwood made each of these representations willfully and wantonly with the intent to defraud Infowhyse. Infowhyse is entitled to punitive damages.

## COUNT II – BREACH OF CONTRACT

108.    Infowhyse incorporates by reference paragraphs 1- 107 of this Complaint as though fully alleged in Count II.

109.    The SPA is a valid and enforceable contract.

110.    Infowhyse has properly performed under the SPA.

111.    Section II(A)(5) of the SPA prohibits Fleetwood from creating or promoting any brand of keypad besides Reply®, or from selling any keypad directly under a third party brand. That section also contains an exception for existing and new OEM agreements.  (Ex. A, SPA at Section II(A)(5).)

112.    The SPA does not define OEM sales, but the parties understood based on their prior licensing relationship and the August, 2014 meetings that OEM keypads would require a unique housing from Reply® keypads and a unique ID in order to prevent OEM keypads from communicating with Reply® Keypads.

113.    Section II(B)(5) of the SPA prohibits Fleetwood from selling any third party products in housing that was paid by Infowhyse or with firmware functionality that was created on behalf of Infowhyse. (Ex. A, SPA at Section II(B)(5).)

114.    Section II(B)(6) prohibits Fleetwood from selling privately branded Reply® products to existing dealers or any other third party, excluding OEM agreements to third parties provided that the OEM products cannot communicate with Reply® products and does not in any way contain the Reply® brand.  All privately branded Reply® products must be offered through Infowhyse or Reply® Systems International. (Ex. A, SPA at Section II(B)(6).)

115.    By selling privately-branded keypads that did not require a unique housing to Innovision, DSI, and potentially others, Fleetwood is in breach Sections II(A)(5), II(B)(5), and II(B)(6) of the SPA.

116.    Infowhyse has been damaged by Fleetwood's breaches.  OEM products require third party customers to invest in a unique housing and ID.  Innovision, DSI, and potentially

others were not required to make that investment on certain of their products, and are instead being provided privately-branded keypads.

117.     Before the SPA, Innovision, DSI, and potentially others purchased Reply® brand products from Fleetwood.  If they were required to invest in a unique housing for new, OEM keypads, they likely would have continued to purchase Reply® keypads from Infowhyse.

118.     Section II(B)(2) prohibits Fleetwood from shipping or otherwise making available any Reply® brand products to any third party after December 31, 2014.  By selling Reply® brand keypads to at least one third party after that date, Fleetwood is in breach of Section II(B)(2) of the SPA.  (Ex. A, SPA at Section II(B)(2).)

119.     Fleetwood should be disgorged of all profits obtained from these impermissible sales.

120.     Section II(G)(1) of the SPA requires Fleetwood to supply all SDK and API command structures to Infowhyse whenever requested, without charge, and without any time restrictions.  (Ex. A, SPA at Section II(G)(1).)  Fleetwood breached that Section by denying Infowhyse access to the command structures that would enable Infowhyse to develop software development kits necessary for the development of software on MAC platforms.  Fleetwood later demanded that unreasonable conditions be met, despite the Fleetwood's unrestricted commitment to provide command structures where appropriate.

121.     Fleetwood has breached the implied covenant of good faith and fair dealing by acting in a manner inconsistent with the parties' reasonable expectations.  By shipping defective keypads to Infowhyse in August and September of 2015, Fleetwood is making it impossible for Infowhyse to grow the sales, revenues, and profitability of Reply® brand products, as set forth in the SPA.

122.     Fleetwood is also breaching the implied covenant of good faith and fair dealing by selling privately-branded keypads to third parties in breach of the SPA.  By removing those third parties from the market of likely Reply® purchasers, Fleetwood is preventing Infowhyse from reaching the $1,000,000.00 sale price to ultimately obtain the Reply® brand.

## COUNT III – TORTIOUS INTERFERENCE
## WITH PROSPECTIVE ECONOMIC ADVANTAGE

123.     Infowhyse incorporates by reference paragraphs 1 - 122 of this Complaint as though fully alleged in Count III.

124.     Fleetwood is providing privately-branded keypads to Innovision, DSI, and potentially others in violation of the SPA.

125.     If not for Fleetwood's willingness to re-brand Reply® keypads for those parties, Infowhyse had a reasonable expectancy of entering into a valid business relationship with Innovision, DSI, and potentially others.

126.     Fleetwood had knowledge of that expectancy because Innovision, DSI, and potentially others were purchasers of Reply®-brand keypads before the SPA was entered into.  If those parties were required to invest in a unique housing, as required under the SPA for OEM keypads, they likely would have continued purchasing Reply® keypads from Infowhyse.

127.     Fleetwood is intentionally and unjustifiably interfering with Infowhyse's expectation of sales to Innovision, DSI, and potentially others by selling privately-branded keypads in violation of the SPA.

128.     Fleetwood has intentionally and unjustifiably interfered with Infowhyse's expectation of growth into new markets with at least two new customers by denying access to the command structures that would enable Infowhyse to develop software development kits necessary for the development of software on MAC platforms.  Fleetwood later demanded that

24

unreasonable conditions be met, despite the Fleetwood's unrestricted commitment to provide command structures where appropriate.

129.     Infowhyse has been damaged by Fleetwood's interference.  All sales revenue and profits from the sales of private branded keypads to Innovision, DSI and potentially others would have been received by Infowhyse if not for Fleetwood's interference.

130.     Infowhyse has been further damaged in that, by usurping sales from Infowhyse in violation of the SPA, Fleetwood is preventing Infowhyse from ultimately reaching the $1,000,000.00 purchase price for the Reply® brand.  By intentionally subverting its own agreement, Fleetwood is attempting to collect royalties from Infowhyse for 10 years and ultimately retain ownership of the Reply® brand if Infowhyse is unable to reach the $1,000,000.00 purchase price.

131.     Fleetwood's interference with Infowhyse's prospective economic advantage was done willfully and wantonly with the intent to damage Infowhyse.  Infowhyse is entitled to punitive damages.

**PRAYER FOR RELIEF**

132.     Plaintiff, INFOWHYSE GMBH, requests that this Court enter judgment in its favor and against Defendant, FLEETWOOD GROUP, INC., in the amount to be proven at trial to fully compensate Infowhyse for Fleetwood's acts and omissions, or alternatively by reforming the SPA to reflect the correct purchase price for the Reply® brand, plus interest, costs, expenses, consequential damages, incidental damages, punitive damages, and all other relief that this Court deems just and proper.

## JURY DEMAND

133.  Plaintiff requests a trial by jury on all claims triable by jury.


Dated: December 14, 2015                    Respectfully submitted,
                                            Infowhyse GmbH


                                            By: ___/s/ Joseph L. Kish_____
                                                 One of Its Attorneys


Joseph L. Kish
Jonathon P. Reinisch
Synergy Law Group, LLC
730 West Randolph Street, 6th Floor
Chicago, Illinois  60661
(312) 454-0015