# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| INFOWHYSE GmbH, a German company with limited liability, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) No. 15 cv 11229<br>) |
| FLEETWOOD GROUP, a Michigan corporation, | ) Judge Jorge Alonso<br>)<br>) Magistrate Judge Jeffrey Cole |
| | )  |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Infowhyse, has filed a motion to compel the defendant, Fleetwood, to produce documents in response to 67 document requests. According to *both* sides' account of their contentious discovery dispute, defendant provided plaintiff with its response to plaintiff's document requests on March 25, 2016, objecting to nearly all those requests. Over the course of the next three months before plaintiff filed this motion, counsel spoke on the phone regarding their dispute on a single occasion, April 22, 2016. Other than that, the two sides exchanged emails or letters – and precious few of those – that, for the most part, did nothing more than indicate the parties were adamantly clinging to the positions with which they began. [Dkt. #31, at 4-8; Dkt. #40, at 4-6]. In other words, the parties failed to comply, in good faith, with the requirements of Local Rule 37.2.

Local Rule 37.2 requires that parties make "good faith attempts to resolve differences" over discovery issues through "consultation in person or by telephone." The command in the rule could not be more explicit. Emails and letters are not enough under Rule 37.2. *O'Toole v. Sears, Roebuck and Co.,* 2014 WL 884776, 1 (N.D.Ill. 2014). There are sound reasons why what the parties are

calling their "*meet*-and-confer" process does not meet the requirements of the Local Rule. The types of angry missives [Dkt. #31-14] exchanged between the parties seldom accomplish anything – proving once again that "discovery is the bane of modern litigation." *Rossetto v. Pabst Brewing Co., Inc.,* 217 F.3d 539, 542 (7th Cir.2000)(Posner, J.).

Parties bring similar battles to the court's attention without first having complied with the Rule far too often:

> Anyone can write a letter. But that does not mean that the recipient will fairly consider the letter before dashing off one of his own that does little more than persist in setting forth his partisan point of view. The letters and the emails that one all too often see do little more than articulate the parties' polar positions with the clash of pretending absolutes left unresolved. Local Rule 37.2 is based on the teaching of long experience that face-to-face discussions are far more likely to result in compromise and agreement than is an exchange of letters that are all too easy to brush aside.

*Slaven v. Great Am. Ins. Co.*, No. 11 C 7993, 2014 WL 4470723, at *2 (N.D. Ill. Sept. 11, 2014). A single phone call in three months regarding a dispute that has engendered nearly 500 pages of briefs and exhibits doesn't come close to sufficing. *See, e.g., Chamberlain Grp. v. Lear Corp.*, No. 05C3449, 2010 WL 2836975, at *2 (N.D. Ill. July 15, 2010)(single face-to-face meeting did not meet the local rule's requirements).

The purpose of Local Rule 37.2 is "[t]o curtail undue delay and expense in the administration of justice." The Rule ultimately rests on what Justice Holmes called the shortness of life and the reality that there is a never ending procession of cases that compete for judicial attention. If the parties can resolve their issue, the court's time is saved and available to be directed to those cases that present issues that cannot be amicably resolved. Each hour needlessly spent on a dispute is an hour squandered. *See Chicago Observer, Inc. v. City of Chicago,* 929 F.2d 325, 329 (7th Cir.1991) ("Litigation is costly not only for the litigants but also for parties in other cases waiting in the queue

2

for judicial attention."). This is a problem that the Seventh Circuit has repeatedly adverted to. *See, e.g., Otto v. Variable Annuity Life Insurance Co.,* 134 F.3d 841, 854 (7th Cir.1998); *Channell v. Citicorp Nat. Services, Inc.,* 89 F.3d 379, 386 (7th Cir.1996); *Szabo Food Service, Inc. v. Canteen Corp.,* 823 F.2d 1073, 1077 (7th Cir.1987).

The Rule benefits not just the court and other litigants, but ultimately, the parties as well. As the resolution of discovery disputes is committed to the court's broad discretion, *Kuttner v. Zaruba*, 819 F.3d 970, 974 (7th Cir. 2016); *James v. Hyatt Regency Chicago*, 707 F.3d 775, 784 (7th Cir. 2013), it behooves parties to work things out on their own. Discretion denotes the absence of hard and fast rules. *Langnes v. Green*, 282 U.S. 531, 541 (1931). Being a range, not a point, discretion allows two decision-makers – on virtually identical facts – to arrive at opposite conclusions, both of which constitute appropriate exercises of discretion. *Compare United States v. Boyd,* 55 F.3d 239 (7th Cir.1995) with *United States v. Williams,* 81 F.3d 1434 (7th Cir.1996). A party that steadfastly maintains its position without budging – as the parties have essentially done here – could be "right", but find itself on the losing side, and properly so, when the matter comes before the court and the court's discretion leads it to accept the other side's "right" position. A negotiated outcome is more likely to give both sides at least a somewhat satisfactory resolution. At least a somewhat satisfactory resolution and once that does not require judicial intervention as the Local Rule and the Federal Rules of Civil Procedure envision.

Accordingly, the plaintiff's motion to compel [Dkt. #31] is denied without prejudice to its refiling – if necessary – once the parties have fully complied with Local Rule 37.2 and have conferred in person or telephonically and attempted in good faith to resolve their issues. Failing that, any discovery motion must contain a detailed, joint statement of the parties' efforts to resolve their

disputes over each of the document requests at issue, along with their final positions, supported by pertinent authority, on each request that remains in dispute. *See Autotech Techs. Ltd. P'ship v. Automationdirect.Com, Inc.*, No. 05 C 5488, 2007 WL 2713352 (N.D. Ill. Sept. 12, 2007); *O'Toole v. Sears, Roebuck & Co.*, 302 F.R.D. 490, 491 (N.D. Ill. 2014).

This will not only demonstrate compliance with the Local Rule, but will facilitate the court's resolution of the five dozen or so requests at issue. As it stands, the parties' presentations in their briefs on this matter are a bit too general to allow for a confident ruling. For example, although nearly all of the plaintiff's 67 requests are at issue, the plaintiff's brief specifically addresses only 20 [Dkt. #31, at 11, 13]; the same is true of the defendant's presentation. [Dkt. #40, at 8, 9]. The only place that specific requests are addressed is in a couple of letters between the parties and those are, in the main, unsupported by any legal argument or case law.

As the parties negotiate – again, in good faith, and that is not without meaning, *cf. Cent. Illinois Light Co. v. Consolidation Coal Co.*, 349 F.3d 488, 492 (7th Cir. 2003)("Duties to bargain in good faith are not empty . . . .") – they should bear in mind that their positions as currently maintained do not appear as bullet-proof as they seem to think. This seems to be a fairly uncomplicated commercial contract dispute, and nothing in either side's submissions paints it as anything more intricate than that. The item that launched this litigation is the defendant's "Reply audience response keypad" – apparently a device that allows audience members at meetings or seminars to vote for whatever might be subject to a vote while the event is going on, [Dkt. #28, ¶ 9]; http://www.replysystems.com/, rather than the traditional method of voting.

In September 2016, the parties entered into a licensing agreement that they called the "Strategic Alliance Agreement." It gave the plaintiff exclusive license to distribute the keypad in

4

Europe, the Middle East, and Asia. [Dkt. #28, ¶¶ 11-12]. By the following August, the plaintiff was interested in an expanded licensing agreement, and its CEO went to Holland, Michigan, to discuss it with defendant's representatives. [Dkt. #28, ¶¶ 13-15].[1]

The parties met on August 13-14, 2014. [Dkt. #28, ¶¶ 15-17]. According to plaintiff's complaint, defendant's representatives told plaintiff's CEO that it sold 77,000 keypads during the fiscal year ending March 2014, but could not provide a detailed breakdown of those sales at that time. [Dkt. #28, ¶ 16]. Under the licensing agreement in place, plaintiff only sold 15,000 keypads in a year, making an expanded agreement attractive to the plaintiff. [Dkt. #28, ¶ 18]. Plaintiff's CEO told the defendant's representatives that he calculated a $1 million purchase price based on the 77,000 unit figure and an increase in sales to 100,000 per year over ten years – *i.e.*, a dollar per unit – and defendant's representatives told him the target was reasonable. [Dkt. #28, ¶¶19-21].

Plaintiff's CEO drafted the agreement now at issue, which the parties called their "Strategic Partnership Agreement ("SPA")", with defendant providing some amendments and clarifications. The parties executed the SPA on August 18, 2014. [Dkt. #28, ¶ 35]. The SPA included an integration clause: "This [SPA] . . . constitute[s] the entire agreement and understanding between the parties and supersedes all prior discussions, agreements, representations, warranties, statements, promises and understandings of every kind and nature as to the subject matter hereof, rendering all prior agreements between the "Parties" null and void." [Dkt. #28-1, Sec. III(3)]. It also included a no-reliance clause: "None of the parties hereto have in any way relied, nor shall in any way rely,

---

[1] Plaintiff is a German company, and the defendant is a Michigan corporation. Plaintiff adverts to no connection with the Northern District of Illinois other than a clause in the parties' contract [Dkt. #28, ¶5] that states that the parties "submit to the exclusive jurisdiction of the state of Illinois and the federal courts." [Dkt. #28-1, Sec. III(2)(emphasis supplied)]. For its part, defendant denies that venue is proper here. [Dkt. #30, ¶ 5].

5

upon any oral or written agreements, representations, warranties, statements, promises or understandings not specifically set forth in this SPA." [Dkt. #28-1, Sec. III(3)].

The plaintiff's complaint goes on for 147 paragraphs and 31 pages, but the core of its lawsuit is that defendant misrepresented the 77,000 sales figure and plaintiff relied on that figure to enter into the SPA. [Dkt. #31, at 3]. Given the no-reliance and integration clauses, plaintiff alleges that the defendant's "representation that it sold approximately 77,000 Reply®-branded keypads during its fiscal year ending March 31, 2014 is incorporated directly into the SPA as an express term." [Dkt. #28, ¶38]. Neither the figure nor the representation are actually mentioned in the SPA; the agreement indicates that keypad sales were in decline. [Dkt. #28-1, at page 3]. The idea seems to be that the incorporation of the past sales figure as what the plaintiff calls an "express" term is in the $1 million price tag. [Dkt. #28, ¶38]. Given the integration and no-reliance clauses, the defendant disagreed with that and, rather early on in this case, has filed a motion for summary judgment on the plaintiff's fraudulent inducement and fraudulent misrepresentation claims. [Dkt. #35].

Many of the plaintiff's requests for production are tied to its fraudulent inducement and fraudulent misrepresentation claims. As the plaintiff has to concede, the parties' agreement includes a no-reliance clause. In *Rissman v. Rissman*, 213 F.3d 381, 384 (7th Cir. 2000), the Seventh Circuit affirmed the district court's grant of summary judgment in a securities fraud case where the stock purchase included a no-reliance clause:

> A non-reliance clause is not identical to a truthful disclosure, but it has a similar function: it ensures that both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication.

213 F.3d at 384. A couple of years later, the court observed:

> parties to contracts who do want to head off the possibility of a fraud suit will

> sometimes insert a "no-reliance" clause into their contract, stating that neither party has relied on any representations made by the other. Since reliance is an element of fraud, the clause, if upheld—and why should it not be upheld, at least when the contract is between sophisticated commercial enterprises—precludes a fraud suit, as the cases we have just cited make clear.

*Vigortone AG Products, Inc. v. PM AG Products, Inc.*, 316 F.3d 641, 644-45 (7th Cir. 2002).

So, the plaintiff is aware of this potential obstacle to its fraud claims. Plaintiff is seemingly wagering all on a district court case, in which the court noted the concurring opinion in *Rissman* emphasized that justifiable reliance in the face of no-reliance clause was an issue that had to be determined on a case by case basis. [Dkt. #31, at 10-11]. Perhaps – and I do not have authority in a discovery referral to directly or indirectly assess the validity of plaintiff's fraudulent inducement and fraudulent representation claims – plaintiff might consider whether the concurring opinion in *Rissman* is too thin a reed on which to support the volume of discovery, including years of documents relating to sales of the keypads prior to the parties' SPA.

It's an important consideration here because, under Fed.R.Civ.P. 26(b)(1), proportionality is a significant factor controlling the scope of discovery. Discovery must not only be relevant to a party's claim or defense, it must also be "proportional to the needs of the case . . . ." Fed.R.Civ.P. 26(b)(1). A number of variables go into the proportionality calculus, including "the importance of the issues at stake in the action, . . . the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed.R.Civ.p. 26(b)(1). Production of the documents relevant to the fraudulent inducement and fraudulent misrepresentation claims surely entail a burdensome and costly search which, under ordinary circumstances, would most likely not be considered unduly burdensome or costly. But, given the circumstances here, Local Rule 37.2's requirement of conferring in good faith suggests that, while

7

plaintiff need not have abandoned its requests, it might have at least considered putting them off until the motion for summary judgment is decided. If it concludes that until there is a definitive ruling its discovery should be limited as discussed above, it should promptly inform this court and the defendants of that decision, which of course will not preclude it from attempting to obtain broader discovery should it prevail on the motion pending before Judge Alonso.

That being said, a pending motion for summary judgment is often not a basis for refusing to produce materials in response to document requests. So when defendant reflexively and repeatedly says time and again in its letter that plaintiff's claim is going to fail, that's not a proper objection to a discovery request. Many cases involve the filing of dispositive motions which the movants presumably feel will succeed. By defendant's reckoning, the movants in all those cases could refuse to participate in discovery, and nearly every case in the courthouse would grind to a halt. This sort of understandably partisan self help is not permissible. There are other legitimate avenues open to the defendant in a circumstance such as this. Perhaps they would have been productive. Perhaps not. But it is for the court, not a party acting in pursuit of its own interest, to make the call. *See, e.g., In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 331, 336-37 (N.D.Ill. 2005). The defendant's obdurate refusal to produce any documents, or even negotiate properly over the issue, merely because it filed a dispositive motion, was itself improper.

Moreover, it cannot be put out of view that the defendant has a bit of a wrong idea about its "participation" in discovery so far. Defendant did not, as it terms it, object to merely "many" of the plaintiff's document requests. [Dkt. #40, at 4]. In fact, defendant lodged sweeping, boilerplate objections to the vast majority – almost 90% – of plaintiff's 67 document requests. [Dkt. #40-4]. Such objections, without proper amplification, were inappropriate in the first instance and will hardly

withstand scrutiny should the parties negotiations fail and plaintiff files another motion to compel. *See Hach Co. v. Hakuto Co.*, 784 F. Supp. 2d 977, 983 (N.D. Ill. 2011)(". . . unamplified boilerplate objections, like 'unduly burdensome' or 'overly broad', will be unacceptable . . . ."); *United Auto. Ins. v. Veluchamy*, No. 09 C 5487, 2010 WL 749980, at *4 (N.D. Ill. Mar. 4, 2010)("Unsupported statements in briefs are not to be credited . . . [neither are] unsupported representations in a blanket refusal to respond to discovery.").

Even when defendant fleshed out certain of its objections in a letter to plaintiff later on, some of those objections seem dubious. For example, right off the mark, defendant objected to Request No. 1 (documents related to the Strategic Alliance Agreement) as irrelevant. When it finally put some flesh on the bones of that contention about a month and a half later, it maintained that it:

> disagrees that discussions surrounding the SAA are relevant to the issues in this litigation. Again, the SPA contains an unambiguous integration clause displacing any and all prior agreements between the parties. The SPA, not the SAA, is the pertinent document in this case. As explained above, in light of the express integration and no-reliance clause in the SPA, any prior discussions or purported representations are immaterial. Therefore, Fleetwood stands by its objections to this request.

[Dkt. # 31-10, at 3]. Yet, defendant itself served a request on plaintiff for:

> [a]ll documents referencing, consisting of, or otherwise relating to the September 16, 2013 Strategic Alliance Agreement between Infowhyse and Fleetwood, including all relevant emails and draft agreements.

[Dkt. #31-15, at 2]. So defendant, in one breath, contends the Strategic Alliance Agreement is irrelevant to the claims or defenses in this case, and in the next breath, maintains that documents regarding that agreement are relevant and demand they be produced.

Defendant takes a similar tack with respect to the plaintiff's fraudulent inducement claim. For example, while the defendant refuses to produce discovery relevant to that claim because it is so confident in its motion for summary judgment, it nevertheless feels plaintiff is on the hook for

documents relevant to the claim asking, for example, that plaintiff "describe with particularity every purported misrepresentation supporting that claim . . . ." [Dkt. #43-2, at 5]. The defendant's stance – refusing to produce the very types of materials it demands from plaintiff – is the kind of position that a court might look at with a jaundiced eye when called upon to resolve a discovery dispute. The plaintiff's motion to compel [Dkt. #31] is denied for the reasons discussed in the preceding Memorandum Opinion and Order.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 7/29/16